Emmitt FOSTER, Appellant,

v.

Paul DELO, Appellee.

No. 92–3557.

United States Court of Appeals, Eighth Circuit.

Submitted March 17, 1993.

Decided Dec. 15, 1993.

Order Granting Rehearing and Rehearing En Banc and Vacating Opinion Feb. 22, 1994.

Gino F. Battisti, St. Louis, MO, argued (Robert T. Haar, on the brief), for appellant.

Stephen D. Hawke, Jefferson City, MO, argued, for appellee.

Before McMILLIAN, Circuit Judge, BRIGHT, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

BRIGHT, Senior Circuit Judge.

Emmitt Foster appeals the denial of his petition for habeas corpus relief pursuant to 28 U.S.C. § 2254. He was convicted of capital murder[1] in the Circuit Court of St. Louis County, Missouri and sentenced to death. Foster raises numerous allegations of error, which fall into three general categories: (1)

---

1. Foster was convicted under Mo.Rev.Stat. § 565.001 (1978) (repealed 1983).

that the district court improperly found many of his claims procedurally barred; (2) that the district court improperly rejected various claims of ineffective assistance of counsel; and (3) that the district court erred in denying relief for assorted state court errors.

We determine that the district court erred in failing to conclude that Foster's counsel provided ineffective assistance regarding Foster's right to testify at the punishment phase of Foster's case. Accordingly, we direct the district court to issue the writ vacating Foster's death sentence. We leave the State of Missouri the option of having Foster resentenced for first-degree murder, or seeking a new hearing on the penalty phase of the capital murder case. As to all other alleged errors, we reject them for the reasons set forth in the magistrate judge's findings adopted by the district court.

## I.

Foster's underlying conviction for capital murder is based on events which occurred in the early morning of November 20, 1983. The state court's findings of fact rely in large part on the testimony of DeAnn Keys, who lived with the murder victim, Travis Walker.

Around 2:00 a.m. on November 20, 1983, Walker received a telephone call from Michael Phillips, a companion from a local softball team whom he had known since childhood. Phillips told Walker he needed assistance with a flat tire. Keys remained in bed and Walker met Phillips and Foster, another companion from the softball team, outside the apartment. Keys next heard the men conversing in the living room and heard Phillips ask to use the phone. After the call, Phillips asked to use the bathroom. He did not enter the bathroom, however, and Keys heard Walker say, "Damn, man, you are tripping." Phillips then entered the bedroom and ordered Keys into the living room at gunpoint.

In the living room, Phillips forced Keys to lie next to Walker. Foster then held Walker and Keys at gunpoint while Phillips searched the bedroom for valuables. After five minutes of searching, Phillips questioned Walker and Keys about their jewelry, at one point placing his pistol in Keys' ear. After concluding he had found all their valuables, Phillips moved toward the main door. Phillips told the two that he and Foster, who was still standing near Walker, were leaving and should not be followed.

Keys then heard and felt a gunshot and lost consciousness. When she regained consciousness, Keys realized she was bleeding from her head. She went to a neighboring apartment to seek help, but found no one. Returning home, she attempted to call the police, but the phone was dead. Fearing she would soon die, Keys wrote twice on an envelope "Mike Philips [sic]" and "John Lee," the name by which she knew Foster.

Responding to a neighbor's phone call, the police arrived to find Walker dead and Keys lying on the bed with a fractured skull and jaw, and several broken facial bones and teeth. Each had received four gunshots to the head.

Keys later identified photos of Phillips and Foster as the assailants. Forensic and ballistics analysis established that the bullets which killed Walker came from a different weapon than those that injured Keys, thus indicating one of the criminals killed Walker, while the other wounded Keys. Police never recovered the weapons.

Phillips and Foster were tried separately in the Circuit Court of St. Louis County. A jury convicted Phillips of first-degree murder[2] and sentenced him to life imprisonment without the possibility of parole.

During the guilt phase of Foster's bifurcated jury trial, the defendant, on counsels' advice, did not testify in his own defense. Counsel did call eight witnesses to support Foster's alibi. The jury found Foster guilty of capital murder. At the punishment phase of the trial Foster again did not testify. The jury recommended a sentence of death, and the judge followed the jury's recommendation. Foster thereafter appealed to the Missouri Supreme Court, which affirmed his conviction. *State v. Foster,* 700 S.W.2d 440 (Mo.

2. Phillips was convicted under Mo.Rev.Stat. § 565.003 (1978) (repealed 1983).

banc 1985), *cert. denied,* 476 U.S. 1178, 106 S.Ct. 2907, 90 L.Ed.2d 993 (1986).

Foster pursued post-conviction relief under Missouri Supreme Court Rule 27.26.[3] Among other claims, Foster asserted that he was denied his right to testify during the penalty phase of the trial. After an evidentiary hearing, the circuit court denied collateral relief. Foster appealed, and the Missouri Court of Appeals affirmed. *Foster v. State,* 748 S.W.2d 903 (Mo.Ct.App.1988).

Foster then filed a *pro se* petition for a writ of habeas corpus with the United States District Court for the Eastern District of Missouri. The district court appointed counsel, and Foster filed an amended petition. The district court referred the case to a United States magistrate judge who, without holding an evidentiary hearing, recommended the denial of Foster's petition. The district court adopted the magistrate judge's report and denied the petition. On November 4, 1992, Foster filed this timely appeal. We reverse the district court's decision denying habeas relief on the issue of ineffective assistance of counsel based on counsels' failure to advise defendant of his right to testify at the penalty phase. We affirm on all other issues.

## II.

Foster contends that counsel violated his fundamental constitutional rights by waiving his right to testify at the penalty phase without first obtaining his informed consent. Foster claims that even though he desired to testify, counsel never informed him that he could do so.

■ Initially the Government asserts that Foster is procedurally barred from raising this claim of ineffective assistance of counsel. The Government bases its argument on the Missouri appellate court's failure to find any indication that Foster desired to testify or that he was misled by counsel or ignorant of his right to testify. The Government contends this factual finding is entitled to a presumption of correctness. Furthermore, even if Foster properly may seek habeas relief on this ground, the Government argues that Foster failed to demonstrate prejudice, and thus cannot prove ineffective assistance of counsel.

■ Foster's claim of ineffective assistance of counsel, based on a violation of his right to testify, was not procedurally defaulted because he raised it before the state court in his Rule 27.26 motion and at the evidentiary hearing. For purposes of § 2254, the court of appeals may review claims alleging essentially the same facts and legal theories presented before the state court. *Kenley v. Armontrout,* 937 F.2d 1298, 1302–03 (8th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 431, 116 L.Ed.2d 450 (1991). The state appellate court rejected the ineffective assistance claim on the ground that Foster failed to show that his failure to testify prejudiced the outcome of the proceeding. *Foster,* 748 S.W.2d at 908. Consequently, the state court had an opportunity to rule on Foster's claim of ineffective assistance of counsel relating to denial of his right to testify, and thus the claim properly came before the district court. *See Laws v. Armontrout,* 863 F.2d 1377, 1392 (8th Cir.1988), *cert. denied,* 490 U.S. 1040, 109 S.Ct. 1944, 104 L.Ed.2d 415 (1989). The Report and Recommendation of United States Magistrate Judge, adopted by the federal district court, rejected Foster's sixth amendment claim for failure to prove prejudice.[4]

■ Because Foster contends his counsel failed to inform him of his right to testify and thus failed to protect that right, we analyze his claim as one of ineffective assistance of

---

3. Missouri Supreme Court Rule 27.26 was repealed February 11, 1987.

4. While defendant bears the risk of error in a post-conviction proceeding, *Coleman v. Thompson,* —— U.S. ——, ——, 111 S.Ct. 2546, 2567, 115 L.Ed.2d 640 (1991); *Mitchell v. Wyrick,* 727 F.2d 773, 774 (8th Cir.), *cert. denied,* 469 U.S. 823, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984), here Foster alleged and argued his ineffective assistance of counsel claim to the state tribunal pursuant to Rule 27.26. That court ruled on the merits of Foster's claim. No bar to federal review exists. *See Ylst v. Nunnemaker,* —— U.S. ——, ——, 111 S.Ct. 2590, 2593, 115 L.Ed.2d 706 (1991); *Evans v. Dowd,* 932 F.2d 739, 741 (8th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 385, 116 L.Ed.2d 335 (1991).

counsel. *See United States v. Teague,* 953 F.2d 1525, 1534 (11th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 127, 121 L.Ed.2d 82 (1992). Under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), Foster must show that his counsel performed deficiently and that the substandard performance prejudiced the outcome of the proceeding. *Id.* at 687, 104 S.Ct. at 2064.

Foster's lead counsel during the guilt phase, Bill Aylward, stated at the Rule 27.26 hearing that a plea for mercy would be inconsistent with Foster's alibi defense during the guilt phase. Accordingly, he did not recommend that Foster testify during the penalty phase. (Post–Conviction Relief Tr. [hereinafter PCR Tr.] Vol. II at 11–13.) Also present at the post-conviction hearing was Assistant County Public Defender Peter Dunne, Foster's lead counsel at the penalty phase. Dunne testified on direct examination, as a witness for the State, as follows:

Q [Mr. Waldemer, counsel for State of Missouri] Did you discuss with Mr. Foster the possibility of his testifying?

A That subject came up more than once, yes.

Q What was the substance of those discussions?

A Emmitt agreed with us that because of his priors and the fact that he would be impeached with them if he did testify that it probably would be better if he did not.

Q Did you explain to Emmitt what would take place during the penalty phase should it be reached?

A Yes.

Q Did you explain to Emmitt he had a right to testify during the trial if he wanted to?

Ms. Soffer [Counsel for Foster]: Objection, your Honor, that's leading.

THE COURT: Sustained.

Q [Mr. Waldemer] Did you discuss Emmitt's testfying [sic]?

A In the penalty phase?

Q At any time time [sic].

A As I recall it, the subject came up principally about testifying in the guilt phase of the trial. I cannot pressume [sic] discussing his testifying in the penalty phase of the trial.

Q Did you advise him whether or not to testify?

A It was our advice at the time that it would be better if he did not.

Q And your reason for that was?

A Our reason was that we did not want his prior convictions to give the jury that reason to convict him of this offense. I didn't want that to be the reason why he was convicted.

(PCR Tr. Vol. I at 93–94.) During cross-examination, Dunne testified further:

Q [Ms. Soffer] With respect to Mr. Foster's failure to testify during the guilt phase you say that you reached a mutual decision, I guess, it wouldn't be in his best interest?

A That's correct.

Q You were in charge of the penalty phase, obviously, and did you in your pre-trial discussions with him tell Mr. Foster that the jury would be informed of his prior convictions at the penalty phase?

A I do not at this time remember saying that, but I in all the occasions that we talked about it I am certain that it came up, but I don't remember right now when it did.

Q You were aware of that fact?

A Oh, yes.

Q Did you tell [Mr. Foster] he could testify in the penalty phase if he chose to do so?

A I don't recall discussing the penalty of him testifying at the penalty phase.

Q Didn't it occur to you that his testimony in the penalty phase would allow the jury to have more insight into the man Emmitt Foster was?

A I guess the answer to that is, no.

Q So you didn't think that could be helpful in terms of it leading to some mitigating evidence?

A I don't see how it could have been.

(PCR Tr. Vol. I at 129–30.) Foster stated he did not know that he could testify at the penalty stage, thus explaining why he did not ask to do so:

Q [Ms. Soffer] Emmitt, in your meetings with Mr. Aylward or Mr. Dunne—well, let me start back, in regards in your meetings with Mr. Dunne before you met Mr. Aylward do you recall whether or not you told him that you wanted to testify in this matter?

A Yes, I asked about testifying.

Q And what was Mr. Dunne's response to that?

A They told me if I testified then they would bring out then—that would give a prosecutor an opportunity to bring out my prior convictions.

Q What did you think when you heard that?

A Well, I didn't want to testify no more. I didn't want them to here [sic] my prior convictions.

Q Did they explain to you that if the case were to go into the penalty phase that the jury would then be informed of your prior convictions?

A No, they didn't.

Q What did they tell you about the penalty phase?

A Nothing in that respect.

Q Did they inform of you whether or not you had the right to testify at that time?

A No, they didn't.

Q After the case was submitted to the jury and it returned its verdict did you at any time ask them if you could testify in the penalty phase?

A No, I didn't have no knowledge that I could testify. So, you know, it never even entered my mind to try to testify I didn't believe I could.

(PCR Tr. Vol. I at 40–41.)

The state court of appeals, based on the foregoing, found that "[t]here is no indication of what [Foster's] testimony would have been. There is no indication that movant was misled by counsel or that he was ignorant of his right to testify." *Foster*, 748 S.W.2d at 908.

The record simply does not support these findings that counsel did not mislead Foster or that Foster knew he could testify at the

penalty phase. Reference to the state appellate court's reasoning offers insight into the basis for the faulty conclusion:

Clearly, counsel advised movant that he had the right to testify during the guilt stage of the trial and that, if he did so, his prior convictions could be used to attack his credibility. Movant decided not to testify during the guilt stage and offered the defense of alibi. Movant also did not testify during the penalty stage of the trial, even though his prior convictions were now admissible as bearing on the issue of punishment. As noted in the testimony of trial counsel at the 27.26 hearing, movant's testimony at that point would have been inconsistent with the defense of alibi during the guilt stage and would not have been beneficial to him.

*Id.* at 907–08.

The fact that Foster knew of his right to testify at the guilt stage does not justify a finding that Foster knew he could testify at the penalty phase. Furthermore, counsels' rationale for advising against Foster testifying at the guilt phase disappeared at the penalty stage. Foster had already been convicted of capital murder, and faced one of two possible sentences, life imprisonment or death. The issue of guilt had been decided; Foster desperately needed to present evidence mitigating against the death penalty. The facts are inescapable that counsel, precisely because they failed to comprehend this significant distinction, misled Foster into believing that testifying at the penalty phase might negatively affect the outcome because of the prior advice given him not to testify at the trial (guilt phase).

The federal court, relying upon the same reasoning as the state court of appeals, concluded: "[p]etitioner's trial counsel made a judgment not to have him testify during the penalty phase because it was believed that petitioner's testimony would not be beneficial to him at that stage of the proceedings." (Report and Recommendation of United States Magistrate Judge at 25.) This finding suffers from the same logical infirmity applied by the state appellate court, and therefore must be characterized as clearly erroneous.

## III.

A criminal defendant's right to put on a defense, including the right to testify in one's own behalf, is a fundamental constitutional guarantee that can only be waived by the defendant himself. *United States v. Bernloehr*, 833 F.2d 749, 751 (8th Cir.1987). *See also Harris v. New York*, 401 U.S. 222, 225, 91 S.Ct. 643, 645, 28 L.Ed.2d 1 (1971). An effective waiver or relinquishment of a constitutional right must be made intelligently, voluntarily and knowingly. *See Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). The evidence presented at the Rule 27.26 hearing, however, does not support the conclusion that counsel explained the possible benefits of Foster exercising his right to testify during the penalty phase. Under these circumstances, Foster had no opportunity to assert his right to testify at the penalty phase.

Counsels' testimony, set forth above, illustrates their misconception as to the role of the penalty phase. Because of the egregiousness of the crime and the fact that evidence of his prior convictions would be admissible regardless of whether defendant took the stand, Foster's own plea to the jury for mercy was absolutely necessary, notwithstanding his earlier alibi defense.

Missouri law effective at the relevant time [5] required the jury, in capital murder cases, to consider both mitigating and aggravating circumstances relevant to the severity of the crime. By failing to properly advise Foster of his fundamental right to testify at the penalty phase, defense counsel precluded the jury from considering information imperative to a valid exercise of its discretion, thus effectively denying Foster his only real chance to avoid the death penalty.

Counsels' conduct, which evinced their failure to comprehend what purpose defendant's exercise of his right to testify would serve, impeded an informed decision whether to waive or invoke a fundamental constitutional guarantee. Counsel performed deficiently.

Foster must also show that counsels' deficient performance prejudiced the proceeding. The state appellate court and the federal district court failed to find prejudice, noting that Foster did not explain at his Rule 27.26 hearing the content of his proposed penalty phase testimony. Foster asserts that ineffective assistance of counsel accounts for his failure to offer specific evidence at the post-conviction relief hearing regarding his proposed testimony.

A showing of prejudice under *Strickland* requires the defendant to establish that counsels' errors were so serious as to deprive defendant of a fair proceeding, thereby rendering the result unreliable. The defendant must show that " 'there is a reasonable probability that, but for counsel[s'] unprofessional errors, the result of the proceeding would have been different.' " *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985) (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068).

The prejudice analysis under *Strickland*, beyond consideration of outcome, requires inquiry "whether the result of the proceeding was fundamentally unfair or unreliable." *Lockhart v. Fretwell*, — U.S. —, —, 113 S.Ct. 838, 842, 122 L.Ed.2d 180 (1993).

Counsels' job at the sentencing hearing was to convince the jury that, notwithstanding the brutality of the murder for which he had been convicted, Foster did not deserve to die. The prosecution sought to prove the contrary, and set out to do so by referring to Foster as a nonperson, sometimes solely as " 'that.' " The following excerpts are illustrative:

A friend, a friend for a few bucks, some pieces of jewelry. That's the manner of man they will have us believe we shouldn't do this. Let him go among the prison population, a prison population where every day other people are locked up for lesser crimes. Guards have to come to work unarmed. You have no right to do that with this man. I submit to you that that's what we mean by deterring him. They, too, the people who have to go to the penitentiary for other crimes which they have committed, have lesser but certain

5. Mo.Rev.Stat. § 565.012 (1978) (repealed 1983).

rights, and they have a right not to be exposed to that. And the guards, while they do an unbelievably courageous job, have a right to some protection. They have a right to that (indicating) not being there, and that's what we call deterring him.

. . . .

... They [referring to the victim's family] had the right to have their son and grandson and brother for the rest of his natural life, until somebody superior to us deemed it time for him to die and not that (indicating).

. . . .

... It is right that he should be executed. There has been some religious discussion here. The Christians have the Golden Rule. 'Do unto others what you would have them do unto you.' Muslims reverse this process, and the Koran says, 'Do not do unto others what you would have him do unto you.' And Confucius says, 'Man should do that which is right, not for hope of reward or for fear of punishment. Man should do what is right, because that is what it means to be a man.' That is what is the essence of man, and that (indicating) is no man.

(Trial Tr. at 975–77 (emphasis added).)

While the prosecution attempted to dehumanize Foster in each juror's mind, the defense failed in its efforts to elicit potentially mitigating evidence pertaining to defendant's life. For example, the defense was precluded from eliciting certain information from defendant's mother.[6] Although counsel challenged the exclusion, no evidence exists that the defense thereafter recognized the ever-increasing urgency in offering Foster's testimony in mitigation.

At the penalty phase, lead defense counsel's closing argument suggested the prejudicial effect of not having his client testify:

MR. DUNNE: .... As I stand here before you in this court, I must confess to you that I am afraid. I am afraid for myself. **I am afraid for Emmitt, that I don't have the ability to speak for him. That I won't be able to find the words that must be said now.** And most of all, I am afraid that even if I did, you would not be swayed.

(Trial Tr. at 979 (emphasis added).)

In this case, prejudice is apparent from the record. The prosecutor referred to defendant as a "that." Foster's mother was restricted in speaking for her son. The evidence shows a fair probability that Foster may not have shot Walker, but that his colleague in the crime, Michael Phillips, did.[7]

We also know, although the jury did not, that this crime, albeit heinous, did not necessarily call for the death penalty, as Phillips had received life imprisonment. At least in this record, no distinction exists between the conduct of Phillips and that of Foster. All of these circumstances lead to a logical conclusion of prejudice to Foster flowing from counsels' deficiency.

Foster had nothing to lose and everything to gain by testifying at the penalty phase. His guilt already had been established. His only chance to escape the death penalty required a plea for his own life, asking the jury for mercy, portraying himself as a human being.

Foster's failure to take the stand because of counsels' incompetence virtually guaranteed the death sentence under the circumstances. Absent counsels' incompetent waiver of Foster's right to testify, there is a reasonable probability the jury would not have recommended the death penalty. *See Smith v. Murray,* 477 U.S. 527, 539, 106 S.Ct. 2661, 2669, 91 L.Ed.2d 434 (1986) (Stevens, J., dissenting) ("The record in this case unquestionably demonstrates that petitioner's *constitutional claim is meritorious,* and that there is a significant risk that he will be put to death *because* his constitutional rights were violated." (emphasis in original)). No

---

6. This exclusion of evidence, resulting from sustained objections made by the Government, does underscore the importance of Foster testifying for himself at the penalty phase.

7. As ballistics disclosed, a separate gun provided the fatal gunshot wounds to Walker than the gun used to shoot and grievously wound Keys. *See supra* p. 1453. A 50% probability exists that Phillips shot Walker with his gun.

claim is made, nor could it cogently be made, that trial strategy entered into the failure of counsel to advise defendant of his right to testify at the penalty phase. *Cf. United States v. Norwood,* 798 F.2d 1094 (7th Cir.), cert. denied, 479 U.S. 1011, 107 S.Ct. 656, 93 L.Ed.2d 711 (1986).

The Supreme Court has made clear the importance of a criminal defendant's right to testify, stating:

> None of these modern innovations [in criminal procedure] lessens the need for the defendant, personally, to have the opportunity to present to the court his plea in mitigation. The most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself [before the imposition of a sentence].

*Green v. United States,* 365 U.S. 301, 304, 81 S.Ct. 653, 655, 5 L.Ed.2d 670 (1961). More recently, the Court observed "the most important witness for the defense in many criminal cases is the defendant himself." *Rock v. Arkansas,* 483 U.S. 44, 52, 107 S.Ct. 2704, 2709, 97 L.Ed.2d 37 (1987).

We conclude that Foster's case shows a proper basis for relief due to incompetence of trial counsel and prejudice under the *Strickland* test.

### IV.

Based on the foregoing, we reverse the district court's order denying Foster's petition for habeas relief and direct the district court to issue a writ of habeas corpus vacating Foster's death sentence. We leave to the State of Missouri the choice of having Foster resentenced for first-degree murder or seeking a new hearing on the penalty phase of the capital murder case. We affirm the district court order denying habeas relief for all other issues raised.

JOHN R. GIBSON, Circuit Judge, concurring.

I concur in the judgment of the court today and in its opinion, but write separately simply to underscore several of my concerns. Foster's counsel briefed twenty-five arguments, including the one that is the basis for the court's decision today. With respect to this issue, the State did not brief the merits, but included it with some ten others in a general argument that they were procedurally barred, and there was no showing of cause and prejudice. The basis for the argument was that Foster had failed to present them in his Rule 27.26 motion. The court today correctly rejects this argument. The claim was presented in the Rule 27.26 motion, and there was considerable testimony on this issue from Foster and his lawyers, Dunne and Aylward, at the Rule 27.26 hearing. It is true that the issue was not decided by the trial court, but the decision of the Missouri Court of Appeals squarely deals with and rejects the issue. *State v. Foster,* 748 S.W.2d 903, 907–08 (Mo.Ct.App.1988). Thus, the State's procedural bar argument must be rejected.

Even though the State did not brief the ineffectiveness argument on the merits, in view of the scatter-shot approach taken by Foster's counsel in briefing, I would be hesitant to conclude that the State has waived the argument on the merits.

The crucial question is whether there is support for the Missouri Court of Appeals' finding that "[t]here is no indication that movant was misled by counsel or that he was ignorant of his right to testify." *Id.* at 908. If not, the finding is not entitled to the presumption of correctness under 28 U.S.C. § 2254(d)(8). In examining the opinion of the state court of appeals and looking to the record to determine if its decision is supported, it is evident that attorney Aylward, who described himself as in charge of the defense and making the decisions, although delegating the penalty phase to Dunne, was clear in his testimony that a plea for mercy by Foster would have been inconsistent with his defense of alibi during the guilt stage. Thus far there would be evidence to support the state court's finding in this respect, and further to demonstrate an exercise of defense counsel's judgment on this issue. Such an exercise of counsel's judgment would be unassailable in a claim of ineffective assistance of counsel.

From this point on the State's position deteriorates. Foster had a right to testify at

his own trial. *Rock v. Arkansas,* 483 U.S. 44, 49, 107 S.Ct. 2704, 2708, 97 L.Ed.2d 37 (1987). The law is clear that the decision as to whether or not to testify is Foster's, and he has the ultimate authority to make this fundamental decision. *Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 3312, 77 L.Ed.2d 987 (1983). This is particularly true in a case such as this where a jury has determined guilt, and the only issue remaining is the choice between life imprisonment or death. Foster may have had long odds on receiving the life sentence, but if he desired to testify, perhaps in the hopes that the jury would see him as a human being and that one juror would decide to grant him life, this was his decision to make.

It is true, as the Missouri Court of Appeals held, that movant did not express a desire to testify, or what his testimony would have been. 748 S.W.2d at 908. The next statement by the court, "there is no indication that movant was misled by counsel or that he was ignorant of his right to testify," is simply not supported by the evidence, and accordingly under 28 U.S.C. § 2254(d)(8) it is not entitled to the presumption of correctness. Both attorneys made clear that they advised Foster not to testify in the guilt phase, but both were uncertain with respect to what they told Foster with respect to the penalty phase. Aylward testified that he did not know in what detail the penalty phase strategy was discussed with Foster, but stated that Foster was aware as to how they were going to proceed. Foster made no request to be allowed to testify. Dunne stated he could not "presume discussing" Foster testifying in the penalty phase of the trial, although it was counsel's advice that it would be better if Foster did not testify because Foster's prior convictions might come into evidence. Dunne stated that he did not recall discussing with Foster the possible negative effects of testifying at the penalty phase. Moreover, it did not occur to Dunne that Foster's testimony at the penalty phase might give the jury more insight into Foster. Dunne could not see how this would have been helpful in leading to some mitigating evidence. Foster was definite that he had not been informed as to whether he could testify at the penalty phase.

Thus, while Foster did not ask to testify, the record is clear that his lawyers were unsure as to whether he had been informed that he had the right to do so. It is evident that Foster was not given sufficient advice to be able make an informed decision about his right to testify.

With this record, there is simply no support for the statement of the Court of Appeals of Missouri that there was no indication that Foster was "misled by counsel or that he was ignorant of his right to testify," and the presumption of correctness as to this finding falls from the case.

## ORDER

Feb. 22, 1994.

Appellee's petition for rehearing with suggestion for rehearing en banc has been considered by the court and is granted. The opinion and judgment of this court filed on December 15, 1993, are vacated. The case is set for oral argument before the court en banc at 1:00 p.m. on Tuesday, May 24, 1994, in the United States Court and Custom House in St. Louis, Missouri.